UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

HYROSHA RENOD WILSON,

                 Petitioner,                Case No. 1:14-cv-640

v.                                        Honorable Robert J. Jonker

DEWAYNE BURTON,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Hyrosha Renod Wilson is incarcerated with the Michigan Department of Corrections at the Kinross Correctional Facility (KCF) in Kincheloe, Michigan.  Following a jury trial in the Muskegon County Circuit Court, Petitioner was convicted of assault with intent to commit murder (AWIM), Mich. Comp. Laws § 750.83; felon in possession of a firearm, Mich. Comp. Laws § 750.224f; and two counts of felony firearm, Mich. Comp. Laws § 750.227b.  On June 13, 2006, the court sentenced Petitioner as a habitual offender-second offense, Mich. Comp. Laws § 769.10, to respective prison terms of 25 to 40 years for Petitioner's AWIM conviction, concurrent to 5 to 7 years for his felon-in-possession conviction, consecutive to two concurrent terms of 2 years for his felony firearm convictions.

        On June 12, 2014, Petitioner filed his habeas corpus petition.  Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court.  *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).  Petitioner placed his petition in the prison mailing system on June 12, 2014.  (Pet., ECF No. 1, PageID.14.)

The petition raises five grounds for relief, paraphrased as follows:

I.      The combined effect of the court rulings: (1) disallowing evidence that the complainant had been shot before; and (2) allowing evidence that the complainant had robbed Petitioner at gunpoint, denied Petitioner a fair trial.

II.     Petitioner's right to a fair trial was violated when he appeared before the jury in a leg brace.

III.    Petitioner was denied a fair and impartial trial due to prosecutorial misconduct and the failure of counsel to object which violates the Sixth and Fourteenth Amendments.

IV.     Petitioner was denied the effective assistance of trial counsel in violation of the Sixth Amendment.

V.      Petitioner is entitled to a new trial based on newly discovered evidence showing that Mr. Wilson was not present in a jail holding cell at the time when two jailhouse snitches claimed he confessed to the crime.

(Pet., ECF No. 1, PageID.7, 10; ECF No. 1-3, PageID.21-23.)  Respondent has filed an answer to the petition (ECF No. 8) stating that the grounds should be denied because they meritless or barred by the doctrine of procedural default.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are without merit.  Accordingly, I recommend that the petition be denied.

## Discussion

I.      Factual Allegations

During the early morning  hours of August 20, 2005, Kenyatta Jones was hanging out near his parked van on Columbia Street in Muskegon Heights, Michigan.  (Trial Tr. II, ECF No. 9-6, PageID.391-392, 447.)  Jones was not alone; his friends Rod McGhee, Marquise Stewart, and Eddie Bradford were with him.  (Trial Tr. II, ECF No. 9-6, PageID.379, 393, 447.)  After a while, an individual dressed in a black hoodie came out of an alley near the group of friends.  (Trial Tr. II, ECF No. 9-6, PageID.361-362, 394, 454.)  The individual approached the group and pulled a handgun.  (Trial Tr. II, ECF No. 9-6, PageID.364-365, 394-395, 455.)  The group scattered.

2

(Trial Tr. II, ECF No. 9-6, PageID.365.)  Jones fled west on Columbia towards Sixth Street.  (Trial Tr. II, ECF No. 9-6, PageID.365-366.)  The gunman followed him.  (*Id*.)  McGhee followed the gunman.  (Id., PageID.367.)

The gunman fired several shots at Jones.  (Trial Tr. II, ECF No. 9-6, PageID.367-368, 456)  Some of the bullets found their mark. (Trial Tr. II, ECF No. 9-6, PageID.456-457.) Jones only made it around the corner.  (*Id*.)  He went down in the front yard of a home on the corner of Columbia and Sixth.  (Trial Tr. II, ECF No. 9-6, PageID.369-370, 457.)  The gunman stood over Jones and fired four more bullets, including one into Jones's head.  (Trial Tr. II, ECF No. 9-6, PageID.458-459.)

Miraculously, Jones survived.  He identified the gunman as Petitioner.  (Trial Tr. II, ECF No. 9-6, Page.ID.459.)  None of the others could identify the gunman because his black hoodie had been pulled up to obscure his face.  (Trial Tr. II, ECF No. 9-6, PageID.364, 373, 380, 396, 407, 454.)  Jones's identification of Petitioner as the gunman was corroborated by two of Petitioner's fellow inmates who testified that Petitioner confessed to the shooting in their presence. (Trial Tr. II, ECF No. 9-6, PageID.535-539; Trial Tr. III, ECF No. 9-7, PageID.590-594.)

Jones testified that Petitioner did not like him because Jones had, months earlier, taken money from Petitioner at gunpoint.  (Trial Tr. III, ECF No. 9-7, PageID.618-630.)  One of the investigating detectives testified that cell phone records revealed that Rod McGhee's cell phone had called Petitioner's cell phone at about the time the group gathered on Columbia Street, supporting the inference that McGhee had tipped off Petitioner as to the whereabouts of Jones. (Trial Tr. III, ECF No. 9-7, PageID.652-659.)

After the prosecution rested, Petitioner presented testimony from friends and relatives to attempt to account for his whereabouts when the shooting occurred.  Petitioner's

brother Lareil testified that Petitioner had entered the home where the two of them lived with their grandmother earlier that night and that if Petitioner had left the alarm would have awoken Lareil. (Trial Tr. III, ECF No. 9-7, PageID.731-747.)  Because Lareil had not woken up after he fell asleep at 2:00 a.m., or perhaps 3:00 a.m., or perhaps 4:00 a.m., he stated that Petitioner could not have left the home.  (*Id.*)

The jury was not convinced by the alibi testimony.  The jurors deliberated for a couple of hours before rendering their verdicts. (Trial Tr. IV, ECF No. 9-8, PageID.827.)

II.    AEDPA Standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not

4

consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-382; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Evidentiary Rulings

Petitioner planned to introduce testimony at trial that Kenyatta Jones had been previously shot in the head.  Petitioner contended that Jones, who had a significant amount of crack cocaine in his pocket when he was shot, "live[d] an inherently dangerous lifestyle and [was] likely to be shot by any number of people . . . ."  (Mot. in Limine Hr'g Tr., ECF No. 9-4, PageID.184.) The individual who shot Jones before, however, was in prison at the time of this shooting.  (*Id*., PageID.185.)  The prosecutor moved to exclude any evidence regarding the prior shooting.  The trial court excluded all testimony regarding the prior shooting because "there [was] not a sufficient nexus between the proffered proof and the issues that are going to be before the jury . . . ."  (*Id*., PageID.185-186.)

For the purpose of proving Petitioner's motive, the prosecutor intended to introduce evidence that Jones had taken Petitioner's money, money he had won from Jones shooting dice, at gunpoint months before the shooting.  Petitioner moved to exclude evidence of that incident, claiming that evidence of the robbery would be character evidence that is inadmissible under Michigan Rule of Evidence 404.  That rule provides:

**(a)    Character evidence generally.**  Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [in four specific instances including] . . . Evidence of the character of a witness [for truthfulness] as provided in Rules 607, 608, and 609.

(b)    Other crimes, wrongs or acts.

(1)    Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other

6

crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Mich. R. Evid. 404.  Petitioner's argument was novel.  (Trial Tr. I, ECF No. 9-5, PageID.192-196.) He started from the proposition that character evidence is not admissible.  That is not an accurate characterization of the rule.  He then concluded that evidence of Jones's "other act"—the robbery—is character evidence and it is being introduced to his detriment.  Therefore, Petitioner argued, the evidence is not admissible.

The trial court analyzed the issue under Michigan Rule of Evidence 404(b) regarding the admissibility of evidence of other crimes.  (*Id*., PageID.198-200.)  The court concluded the evidence was relevant as to Petitioner's motive and, therefore, admissible.  (*Id*.)  In this instance, however, there certainly appears to be a shorter path to that result.  The "other acts/character" evidence was not offered to show that Petitioner (or Jones, for that matter) acted in conformity with the "other act" at some later date.  Indeed, it is difficult to imagine how the evidence could be offered or used for that impermissible purpose.

Petitioner contends that excluding evidence of the prior shooting and admitting evidence of the armed robbery operated in combination to deprive him of a fair trial.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so

7

rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

First, with regard to the admission of evidence regarding the victim's armed robbery of Petitioner—even though the evidence here seems entirely unrelated to the purposes of Rule 404(b)—there is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by admitting evidence of other bad acts under Rule 404(b). In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d 496 at 512. Thus, standing alone, the admission of the prior armed robbery evidence did not violate Petitioner's due process rights.

Second, with regard to the trial court's exclusion of the prior shooting evidence, the exclusion might have constitutional implications, but only if it denied Petitioner the right to present a defense.  The Supreme Court has determined that a criminal defendant has the right to a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984), *quoted in Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  The right is derived from the Sixth Amendment rights to compel and confront witnesses and from the Due Process Clause of the Fourteenth Amendment.  *See Holmes*, 547 U.S. at 324; *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process law.").

The Supreme Court, however,  repeatedly has recognized that the right to present a defense is subject to reasonable restrictions.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers*, 410 U.S. at 295; *see also Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

> [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve.  Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Scheffer*, 523 U.S. at 308 (internal citations omitted).

In *Holmes*, 547 U.S. at 319, the Supreme Court considered the constitutionality of a South Carolina rule that excluded evidence of a third party's guilt.  The Court explained:

While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.  *See, e.g.,* Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904).  Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"  *Crane*, 476 U.S., at 689–690 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); ellipsis and brackets in original). *See also Montana v. Egelhoff*, 518 U.S. 37, 42, (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged.  *See, e.g.*, 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide § 286, pp. 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)).  Such rules are widely accepted, and neither petitioner nor his amici challenge them here.

*Holmes*, 547 U.S. at 326-327.

The trial court's reasoning here closely tracks the "widely accepted" rule.  The court concluded the evidence of third party guilt was simply too remote.  The Michigan Court of Appeals affirmed that determination stating:

Defendant's theory of the case was that he was not the shooter, and that, because the victim was involved in the drug culture, he was likely to be shot by any number of people.  However, as found by the trial court, the shooter in the previous case had been convicted and was incarcerated at the time of the shooting.  Therefore, that evidence did not have a tendency to make the existence of any fact that was of consequence to a determination of this particular action more or less probable than it would be without the evidence.  Conversely, substantiated evidence that a person or persons other than defendant had a motive to shoot the victim, and had the

10

opportunity to do so, would have been relevant. *See People v. Holliday*, 144 Mich App 560, 572-574; 376 NW2d 154 (1985). However, defendant did not come forward with any specific evidence regarding the identity of other individuals who may have shot the victim. He failed to tie the previous shooting or shooter with anyone in particular who may have been following up on the prior shooting. Defendant failed to substantiate his general assertion that someone involved in the drug scene was responsible for shooting the victim. This broad allegation, without more, did not meet the level of specificity required to make evidence of a prior shooting relevant to the shooting at issue here.

(Mich. Ct. App. Op., ECF No. 9-27, PageID.1305-1306.)   The state courts' reasoning here is entirely consistent with, and not contrary to or an unreasonable application of, clearly established federal law.

Because Petitioner's claim that evidence was improperly admitted is without merit and his claim that evidence was improperly excluded is without merit, the cumulation of the claims is without merit as well. *See Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.").

IV.    Leg Brace

Petitioner wore a leg brace under his clothing during the trial. (Feb. 5, 2007, Hr'g Tr., ECF No. 9-13, PageID.938.) The leg brace required him to operate a lever to bend his knee as he walked. (*Id*., PageID.936.) The purpose of the brace is to make it difficult to run. (*Id*., PageID.931, 950.) Petitioner, at a post-trial hearing, testified that he walked into the courtroom and then walked with his counsel to a separate room and back to the defense table before jury selection had even begun at a time when the entire jury venire was seated in the courtroom on the benches. (*Id*., PageID.934-935.)

11

The trial judge was not present in the courtroom at the time; however, the court credited Petitioner's testimony regarding the incident.  (*Id*., PageID.949-950.)  The court also found that the brace was not visible and no objection was made. (*Id*., PageID.950.)  The court went on to suggest that, because the testimony was undisputed that the gunman ran, the peculiar gait caused by the leg brace may have actually operated to Petitioner's benefit.  (*Id*., PageID.950-951.) The court of appeals also concluded Petitioner had failed to show any prejudice:

> Freedom from shackling of a defendant during trial is an important component of a fair and impartial trial because having a defendant appear shackled before a jury negatively affects the defendant's constitutionally guaranteed presumption of innocence. *People v. Banks*, 249 Mich App 247, 256; 642 NW2d 351 (2002).  We review unpreserved claims of constitutional error for plain error affecting substantial rights. *People v. Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999).
>
> In order to justify reversal based on the presence of shackles or restraints during trial, the defendant must show that prejudice resulted.  *People v. Robinson*, 172 Mich App 650, 654; 432 NW2d 390 (1988).  Defendant argues that he was prejudiced by walking in front of the venire with a staggered gait in light of the prosecutor's elicitation of testimony that a witness told a detective that he thought defendant was the shooter based on the way the shooter walked.  However, if anything, defendant's limited mobility weighed in his favor, where evidence was presented that the shooter ran after the victim and shot him during the ensuing chase.  Further, the prosecutor specifically commented during opening statements that he would not expect the jury to find a person guilty based on an identification made based on the way someone walks, and that it was merely an additional piece of evidence to consider.  The possible inadvertence of the jury venire's exposure and defendant's lack of objection to wearing the brace before or during trial also mitigate against a finding of prejudicial error.  *See Robinson*, supra at 654 (noting that no objection was made to the presence of the restraints during trial).  Defendant has failed to establish prejudice, and no plain error occurred.

(Mich. Ct. App. Op., ECF No. 9-27, PageID.1309.)

The visible use of physical restraints on a criminal defendant might violate three fundamental legal principles: (1) the presumption of innocence; (2) an accused's ability to secure a meaningful defense by assisting counsel; and (3) the maintenance of a dignified and decorous judicial process. *Deck v. Missouri*, 544 U.S. 622, 630-32 (2005).  The Supreme Court concluded

that the risk to those rights required courts to evaluate the circumstances of the particular case before permitting the use of visible restraints.  *Id.* at 632.

No such individualized evaluation occurred before restraints were imposed on Petitioner.  The trial judge acknowledged that he permitted the restraints to be used routinely because they were not visible.  The judge's decision—to routinely permit the use of restraints that were not visible—is entirely consistent with the clearly established federal law set forth in *Deck*. *See, e.g., Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) ("'[V]isible' marks the key inquiry for us because a claim based on *Deck* 'rises or fall on the question of whether the [restraint] was visible to the jury.'"); *Adams v. Bradshaw*, 826 F.3d 306, 317 (6th Cir. 2016) ("[T]he visibility of a physical restraint upon a defendant to a jury [is] a critical factor to obtaining relief in such circumstances."); *Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009) ("Because the Supreme court had stressed 'at least six times' the limitation of its holding to visible restraints, we held that *Deck* 'concerned only *visible* restraints at trial.'") (citation omitted, emphasis in original); *Mendoza v. Berghuis*, 544 F.3d 650, 655 (6th Cir. 2008) ("Mendoza's restraints were not visible to the jury during trial.  And the clearly established precedent upon which he relies—namely *Deck*—is expressly limited to cases where the defendant's shackles are 'visible to the jury' during trial.") (citation omitted, emphasis in original).  Here, Petitioner specifically acknowledged that the brace was inside his pants and not visible to the jury.  (Feb. 5, 2007 Hr'g Tr., ECF No. 9-13, PageID.923.)  Thus, the state court's determination that the brace was not visible was eminently reasonable.

Moreover, even if a member of the venire concluded from Petitioner's gait that Petitioner was wearing a physical restraint and even if that conclusion might render the restraint "visible" for purposes of *Deck*, there is no clearly established law requiring an individualized

13

evaluation to support the use of such a "visible" restraint during *voir dire*.  *Keys v. Booker*, 798 F.3d 442, 455 (6th Cir. 2015) ("[A]s plausible as these lines of argument may be, they are outside the scope of this court's charge on habeas review. . . . The Supreme Court has never indicated, for instance, that its prohibition against shackling applies as early as *voir dire*, a stage at which double jeopardy has yet to attach.").

Petitioner has failed to show that the state court's rejection of his shackling claim is contrary to, or an unreasonable application of, *Deck*.  Accordingly, he is not entitled to habeas relief on the shackling claim.

V.    Prosecutorial Misconduct

Petitioner contends that the prosecutor's improper statements during closing argument rendered the trial fundamentally unfair.  Petitioner challenges two distinct parts of the prosecutor's closing argument: (1) the argument regarding witness Ramon Grissom's cell phone; and (2) the argument regarding the alibi witness testimony.

A.    The cell phone

Petitioner's friend Ramon Grissom testified that he dropped off Petitioner at Petitioner's home by 2:30 a.m. on the night of the shooting.  (Trial Tr. III, ECF No. 9-7, PageID.718.)  The prosecutor asked Grissom if he had a cell phone number.  (*Id*., PageID.725.) Grissom said he did not.  (*Id*.)  He also said he did not have a cell phone number when he drove the Petitioner home.  (*Id*.)  He acknowledged using his father's cell phone.  (*Id*., PageID.726.) When the prosecutor asked Grissom to identify cell number 638-6667, Grissom admitted it was his own cell phone number, at least the number he had back on the night of the shooting.  (*Id*., PageID.727-728.)

14

After Petitioner closed his proofs, the prosecutor called Detective Steven White in rebuttal.  Detective White testified that Petitioner's counsel had provided Grissom's cell number, 638-6667 to the detective.  (Trial Tr. III, ECF No. 9-7, PageID.748-749.)  Detective White interviewed Grissom by telephone.  (*Id*.)  At that time, Grissom told the detective that he dropped Petitioner off at 1:30 a.m., not 2:30 a.m.  (*Id*.)

The prosecutor also asked Detective White about an incident that occurred just moments earlier.  Detective White testified that Grissom, after testifying he did not have a cell phone at that time, on his way out of the courtroom answered a ringing cell phone that he had on his person.  (*Id*., PageID.749-750.)  Detective White testified that everybody started laughing.  (*Id*.)

The next day, with regard to Ramon Grissom, the prosecutor argued:

> I mean, Ramon Grissom sat on that stand and just lied through his teeth to you. I mean, one of the questions was: Do you have a cell phone? No. I mean, the only thing that would have been better is if it had started ringing right while he sat there. You know, and it wasn't one of these, you know, just a little ring, it was one of these things that plays an obnoxious song for like 10 seconds.  That's what happened when you were in the – back in your – in your jury room.

(Trial Tr. IV, ECF No. 9-8, PageID.798-799.)  Petitioner's counsel objected.  The court sustained the objection stating, "that is something the jury has not heard or seen in the course of evidence in the trial so you'll disregard it."  (*Id*., PageID.799.)  The prosecutor continued:

> What I will talk about is the testimony -- what you did hear or see during the course of the trial was the testimony of Detective White who described for you what happened that you didn't see. And the testimony of Detective White was that -- that while you were in the jury room, as Mr. Grissom was leaving and saying good-bye to somebody, his cell phone goes off and everybody starts laughing about it because of what happened on the stand.

(*Id*.)

To be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*,

477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

   "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

   Petitioner complains that the prosecutor impermissibly argued facts not in evidence and vouched for his witness. A prosecutor is not limited to simply recounting the evidence during

16

closing argument. She may also argue reasonable inferences from the evidence. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Nonetheless, it is unquestionably improper for a prosecutor to argue facts not in evidence. *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004) (citing *Berger*, 295 U.S. at 78). The only facts offered by the prosecutor that were not part of Detective White's testimony were the prosecutor's statements regarding the nature of Grissom's ring tone.

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard). The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955).

The prosecutor's "vouching" in this instance leans toward the second type. He offers other evidence known to the prosecutor but not introduced into evidence. In Petitioner's case, however, the evidence had nothing to do with Petitioner's guilt. To the contrary, the prosecutor's "facts not in evidence" were rather innocuous. Even so, Petitioner's counsel objected and the court instructed the jurors to disregard the comment.

The Michigan Court of Appeals considered the entirety of the circumstances surrounding the objectionable argument in rejecting Petitioner's prosecutorial misconduct challenge:

> During rebuttal argument, the prosecutor attempted to discredit the veracity of Ramon Grissom, a defense witness.  The prosecutor argued that, while Grissom testified at trial that he did not own a cellular phone, his testimony was untruthful because he did, in fact, have a phone which rang in the courtroom, outside the presence of the jury.  Defense counsel objected on the ground that the argument constituted facts not in evidence, and the trial court sustained the objection and instructed the jury to disregard the statement.  On appeal, defendant argues that the prosecutor's argument constituted facts not in evidence and that it constituted improper vouching.
>
> A prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, but is free to argue the evidence and any reasonable inferences that may arise from the evidence.  *People v. Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003).  Although Grissom's cellular phone rang outside the presence of the jury, the prosecutor called a detective to testify as to the event.  Thus, the fact that Grissom's cellular phone rang in court was admitted into evidence, and the prosecutor's argument was proper.   Additionally, the trial court's curative instruction alleviated any prejudicial effect.  *People v. Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000), overruled on other grounds *Crawford v. Washington*, 541 US 36 (2004) ("[n]o error requiring reversal will be found if the prejudicial effect of the prosecutor's comments could have been cured by a timely instruction").
>
> A prosecutor may not vouch for the credibility of a witness or suggest that the government has some special knowledge that a witness is testifying truthfully.  *People v. Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997).  However, a prosecutor is permitted to argue from the facts that defendant or defendant's witnesses are unworthy of belief.  *People v. Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007).  Defendant's claim of improper vouching lacks merit, given that the challenged comments reflected arguments from the facts and evidence that Grissom was unworthy of belief.  No plain error occurred.

(Mich. Ct. App. Op., ECF No. 9-27, PageID.1307-1308.)

The state appellate court's analysis, although relying on state court authority, tracks the Supreme Court precedent cited above.  The court of appeals' determinations are entirely consistent with, and not contrary to, the clearly established federal law regarding prosecutorial misconduct.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

18

### B.    Denigrating the defense

Petitioner also claims the prosecutor impermissibly denigrated defense counsel.  A prosecutor is free to argue from the evidence that certain defense witnesses are lying but may not denigrate the defense or defense counsel.  *See Hanna v. Price*, 245 F. App'x 538, 545-46 (6th Cir. 2007); *Bates v. Bell*, 457 F.3d 501, 525 (6th Cir. 2006).   Not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict.  *See Young*, 470 U.S. at 11 (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial").  "A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992); *see also Brown*, 231 F. App'x at 480 (a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper disparagement of defense counsel).

In closing argument, Petitioner's counsel, after reviewing the evidence offered by the prosecutor, also analyzed the defense evidence as follows:

> Alibi witnesses. Whether you believe the alibi or not, it does not change the Prosecutor's burden.  You must prove beyond a reasonable doubt that Hyrosha Wilson was at the scene of the crime and committed the crime.  An alibi does not take away one bit from that responsibility of the prosecution.  We need prove nothing in this matter.

(Trial Tr. IV, ECF No. 9-8, PageID.797.)  That prompted this response from the prosecutor during rebuttal:

> Maybe I'll start with the alibi. I guess we did a good job if all the defense lawyer is going to say about his alibi evidence is, well, remember they still have to prove their case.  That's all he says about his alibi.

Actually, the law says that the defense doesn't have to do anything.  They don't have to put on a defense; but if they do, you can look at the defense and what kind of defense it is and how bad the defense is and how bad it blew up in their face and use that as evidence of guilt.  It's part of the circumstantial package of evidence that proves he's guilty, the lies that he tried to put on on the stand, and you can use it for that.  And he didn't want to touch that alibi with a 10-foot pole, but I guess he had to say something about it.

*     *     *

Now let's talk about Lareil Wilson.  Lareil Wilson gets on the stand, first thing he testifies to is is, you know, he started laying this alarm system at the house, this great alarm system because, you know, they know that the Prosecutor is going to say: Hey, look, just because he came home at one time doesn't mean he didn't go out the back door, didn't crawl out the window.  Now he's got an alibi because he saw him.  Right?

You know, and this house is just minutes away from the crime scene.  So he says: We got an elaborate alarm system on the house.  It's on the front door, it's on the back door, it's on every window.  And is it loud enough to wake up everybody?  Oh, yeah. You know, I can't sleep through that.  And so I said: So when Hyrosha came home, it obviously woke up grandma?  Grandma lives in the house, too.  Well, naw, naw, no.  Where is grandma?  They put on a defense.  I'm allowed to talk about who they didn't put on.  Where is grandma?  She's not here because she's not willing to come in and be part of this lie, that's why she's not here.  That whole alibi defense just blew apart.

*     *     *

One of the things that you can also consider when we're talking about the alibi that blew up, we talk about they put on this alibi and they don't call an obvious alibi witness like the grandmother.  The other thing that you can look at is has there been any evidence of -- efforts to affect the witnesses in the case.  And there was testimony from the Defendant's girlfriend during cross-examination that, yes, they had a conversation about getting Derrick to say he had the phone or take the fifth and that sort of thing, another piece of circumstantial evidence that adds to the package.

(Trial Tr. IV, ECF No. 9-8, PageID.797, 800, 804.)

Petitioner argues that the prosecutor's comments with regard to lack of truthfulness are directed at counsel.  The trial court disagreed.  The court acknowledged that such comments directed to counsel would be improper but found that the prosecutor's comments here were proper because they were directed to the witnesses and the testimony.  (Feb. 5, 2007, Hr'g Tr., ECF No.

9-13, PageID.946-948.)   The appellate court also concluded the remarks were attacks on the witnesses and the alibi testimony:

> Also during rebuttal argument, the prosecutor commented on the weakness of defendant's alibi defense, as well as defendant's failure to produce his grandmother as an alibi witness.  Defendant argues that the prosecutor's comments improperly denigrated defense counsel by intimating that he arranged for the defense witnesses to lie under oath.  A prosecutor may not suggest that defense counsel is intentionally trying to mislead the jury.  *People v. Watson*, 245 Mich.App 572, 592; 629 NW2d 411 (2001).  However, once a defendant presents an alibi defense, a prosecutor is permitted to attack the alibi by commenting on the weakness of the alibi testimony, as well as a defendant's failure to produce corroborating witnesses.  *People v. Holland*, 179 Mich.App 184, 190-192; 445 NW2d 206 (1989).  There was no error.
>
> The prosecutor also commented that defendant and his girlfriend, Lakesha Rankin, discussed having her brother, Derrick Hunter, acknowledge possession of defendant's cellular phone at the time of the incident.  However, defendant's girlfriend admitted as much on cross-examination, and the prosecutor was permitted to argue the evidence and any reasonable inferences arising from the evidence.  *Ackerman, supra* at 450. The prosecutor's remarks were proper in light of the evidence and defense theory presented.

(Mich. Ct. App. Op., ECF No. 9-27, PageID.1308.)

The state courts' findings regarding the subject of the prosecutor's remarks are not unreasonable on this record.  The further conclusion that such commentary on the evidence is permissible is entirely consistent with clearly established federal law.  Accordingly, Petitioner is not entitled to habeas relief on this prosecutorial misconduct claim.

### VI.    Ineffective Assistance of Trial Counsel

Petitioner next complains that his trial counsel rendered ineffective assistance in violation of the Sixth Amendment because counsel failed to interview or call as a witness Rodriguez McGhee.  McGhee was present the night of the shooting.  He drove Ken to Columbia Street in Ken's van.  After the shooter appeared, McGhee followed the shooter and Jones as Jones fled.  Other witnesses testified that McGhee possessed a gun on the night of the shooting, but McGhee took no action to stop the shooter or defend Jones.

Jones testified that he felt McGhee go through Jones's pockets while Jones was down after being shot. (Trial Tr. II, ECF No. 9-6, PageID.460-461, 505.) Eddie Bradford confirmed Jones's testimony. (*Id.*, PageID.370.) Jones claimed that he was missing money and his keys thereafter. (*Id.*, PageID.508.) The police report indicated McGhee was in possession of blood-stained money when he was interviewed. (Police Report, ECF No. 9-29, PageID.1692.) Jones also testified that his home was burgled while he was in the hospital after the shooting. (Trial Tr. II, ECF No. 9-6, PageID.508.)

Moreover, immediately before the shooting, the Petitioner's cell phone called McGhee's cell phone. (Trial Tr. III, ECF No. 9-7, PageID.651-655.) Later, the afternoon following the shooting, McGhee's cell phone called Petitioner's cell phone. (*Id.*)

Police reports indicated McGhee could not identify the shooter. (Police Report, ECF No. 9-29, PageID.1692.) An affidavit executed by McGhee three years after the shooting went one step further: McGhee swore the shooter was not Petitioner. McGhee's affidavit provides:

1.    In 2006 I was brought to the Muskegon County Courthouse for the trial of Hyrosha Wilson.

2.    While out of the courtroom in a back office Detective Steve White of the Muskegon Heights police came in to talk to me.

3.    Detective White told me all that I had to say was that it was Hyrosha Wilson who shot Ken and I told him that I would not do that then. He told me that he will make sure that I got a lot of time and asked me if I wanted to plead the Fifth.

4.    I knew that Hyrosha Wilson was not the person who shot Ken because I seen the face of the shooter and it was not Hyrosha Wilson.

5.    I don't know who the shooter was, but I do know that it was not Hyrosha Wilson.

(Affid. of Rodriguez McGhee, ECF No. 9-29, PageID.1660.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.

22

Under *Strickland*, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

23

The trial court relied on *Strickland* in rejecting Petitioner's claim that the failure to call McGhee constituted ineffective assistance:

> Counsel's assistance is ineffective if it falls short of an objective standard of reasonableness and is constitutionally deficient. *See, Reed, supra*. Defendant's claim of error with regard to trial counsel is that he failed to interview and call Rod McGhee to testify. He was listed as a witness by the prosecution. Defendant's Appendix B. In accordance with pretrial practice in this court, the Prosecutor routinely furnishes copies of all police reports to the defense. The report in this case indicated that McGhee was present at the scene of the shooting but did not know who the perpetrator was. Defendant's Appendix A. At the time this motion was filed, McGhee submitted an affidavit restating that he did not know who the shooter was and it was not this Defendant. Defendant's Appendix D. It is noteworthy that there is no evidence that this witness was prepared to present this testimony at the time of trial. Indeed, the evidence at trial suggested that McGhee may have been an accomplice or, at a minimum, been guilty of some form of a larceny at the scene. Under those circumstances he would be entitled to the protections of the 5th Amendment.
>
> At this point it is pure speculation as to whether or not McGhee would have testified or what he would have actually said. This is important because one of the required showings for ineffective assistance claims is there be a reasonable probability that the trial's outcome would have been different but for the error. First, the Court notes that it is apparent that defense counsel did not fail to investigate. He ostensibly had the police report in which McGhee, along with all of the other witnesses, but for the victim who was closest to the shooter, indicated they did not know who it was. Reviewing a police report is certainly part of an investigation and that was done here. Moreover, Defendant has not shown that there is a reasonable probability that McGhee would have testified or that his testimony would have exonerated the Defendant which would be required for an ineffective assistance claim. *See, Strickland v Washington*, 466 US 668 (1984).

(July 28, 2010 Muskegon Cty. Cir. Ct. Op., ECF No. 9-21, PageID.1182-1183.)

The trial court's determinations regarding counsel's investigation are not unreasonable. There is no record evidence supporting Petitioner's claim that his counsel did <u>not</u> investigate McGhee's likely testimony or interview McGhee. But, whatever actions counsel took with respect to McGhee before trial, counsel did not call McGhee as a witness.

It is possible that McGhee intended to take the protections of the Fifth Amendment and told Detective White as much before the trial. McGhee's affidavit is conspicuously silent with

24

regard to his answer to Detective White's inquiry regarding McGhee's intention.  If McGhee planned to avail himself of the Fifth Amendment's protection, it is unlikely either the prosecutor or the defense could call him as a witness.  *See, e.g., United States v. Ballard*, 280 F. App'x 468, 470 (6th Cir. 2008) ("[W]e are not persuaded that a defendant should be permitted to call a privilege-asserting witness to the stand for the sole purpose of allowing a jury to draw negative inferences of culpable conduct, while simultaneously maintaining that the same maneuver by the prosecutor would constitute a constitutional violation.").  The negative inference from the McGhee's invocation of the privilege would undoubtedly operate against Petitioner.

Even if the Fifth Amendment privilege were not at issue, there are apparent strategic reasons to avoid calling McGhee.  The prosecutor had presented evidence that McGhee would have been hard-pressed to explain away: McGhee was present when Jones put a gun to Petitioner's head and took Petitioner's money, two weeks before the shooting McGhee had communicated with Jones to facilitate Jones's return of at least some of Petitioner's money, McGhee drove Jones to the location where the shooting occurred, Petitioner's phone called McGhee's phone immediately before the shooting,  McGhee followed Jones and the shooter when everyone else ran away, McGhee went through Jones's pockets after Jones had been shot, Jones was missing money and his keys after the shooting, McGhee left in Jones's van, Jones's house was robbed while he was in the hospital, and McGhee's phone called Petitioner's phone after the shooting.  The prosecutor leaned on this evidence to suggest to the jury that McGhee was an accomplice.  Jones, Stewart, and Bradford had all expressed suspicions that McGhee may have helped facilitate the shooting.

It is difficult to conceive of answers that McGhee could have provided that would work to Petitioner's benefit.  If McGhee claimed he had seen the shooter's face well enough to

confirm it was not Petitioner, as stated in his affidavit years after the trial, his testimony would have stood in stark contrast to the testimony of everyone else present.  Only Jones saw the shooter well enough to identify him and that only occurred when the shooter stood over him.  The rest of the witnesses said the shooter's hoodie was tied too tightly to permit identification.  McGhee's testimony, if it exonerated Petitioner, would have only fed in to the prosecutor's theory that McGhee was an accomplice.

Under the doubly deferential standard this Court must apply, there is a reasonable argument Petitioner's counsel's decision to forego calling McGhee fell within the wide range of professionally competent assistance.  Therefore, Petitioner has failed to establish that the state court's rejection of his ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland* and he is not entitled to habeas relief on his ineffective assistance of counsel claim.

VII.    Newly Discovered Evidence

Finally, Petitioner contends there is newly discovered evidence that demonstrates his innocence.  The claim was raised for the first time in one of Petitioner's motions for relief from judgment.  The trial court resolved the issue as follows:

> The second issue raised by the Defendant involves alleged newly discovered evidence.  The prosecution called two witnesses at trial who claimed to have heard the Defendant admit that he shot the victim.  The conversation was to have taken place in a holding cell at the jail.  One of the inmates testified that Tony Walker was in the cell at the time the Defendant made the admissions.  Tony Walker has submitted an affidavit which the Defendant claims to be a contradiction of the testimony of the two inmates.  Mr. Walker recalls a conversation with one of the witnesses "at the end of 2005".  Defendant's Appendix F.  He says the Defendant was not present in the holding cell at the time.  He does not state whether the other testifying inmate was present.  He is not specific as to the date.  One of the inmates testified that the conversation occurred on November 10, 2005.  The jailhouse manager testified that on that date both of the prosecution's witnesses and the Defendant were out of their cells at the same time of day and could have been in the holding tank together.
>
> The Defendant must show that it is probable that Walker's testimony would result in an acquittal on retrial.  *People v Davis*, 199 Mich App 502; 503 NW2d 457

(1993).  As with McGhee's testimony, it is entirely speculative as to what the impact of Walker's testimony would have been on the jury.  It clearly can't be said that the jury probably would have rejected the testimony of one inmate as well as the corroboration by another witness as well as the jail administrator's corroboration in favor of Mr. Walker.  Moreover, it cannot be said that it is probable that Mr. Walker's testimony would have caused the jury to also reject the testimony of the victim that the Defendant was the person who looked into his eyes and shot him multiple times.

(July 28, 2010 Muskegon Cnty. Cir. Ct. Op., ECF No. 9-21, PageID.1183-1184.)

        The constitutional foundation of Petitioner's "newly discovered evidence" claim is somewhat elusive.  The petition claims that his right to fair trial was violated.  "There is no basis in text, tradition, or even in contemporary practice (if that were enough) for finding in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction."  *Herrera v. Collins*, 506 U.S. 390, 427-28 (1993) (concurring opinion of Justice Scalia).  Petitioner acknowledges this limitation in his answer to respondent's response.  (Pet'r's Reply Br., ECF No. 10, PageID.1924) ("Petitioner agree[s] with the Respondent, that an independent claim of 'Newly Discovered Evidence' <u>will not</u> warrant Habeas Relief!").  Citing *Herrera*, Petitioner claims that newly discovered evidence can state a ground for federal habeas relief if there is an independent constitutional violation.  (*Id.*, PageID.1925.) Petitioner then proceeds to identify a number of such independent constitutional violations, including violation of Petitioner's right against self-incrimination (*Id.*, PageID.1926), and prosecutorial misconduct in presenting knowingly false jailhouse "snitch" testimony (*Id.*, PageID.1928).  Neither claim was presented to the state courts and neither claim  has merit.

### A.     Self-Incrimination

        The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  But, here, Petitioner was not compelled to speak to the jailhouse "snitches."  The lack of compulsion is fatal to his

27

claim.  *See, e.g., Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004) ("The Fifth Amendment prohibits only compelled testimony that is incriminating."); *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985) ("The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony.").

Perhaps recognizing that limit, Petitioner shifts to claiming use of the jailhouse informants was a violation of Petitioner's Sixth Amendment rights similar to the violation described in *Massiah v. United States*, 377 U.S. 201 (1964).  In *Massiah*, the Court considered the Sixth Amendment implications of admitting a "confession" made to a codefendant that was overheard by a government agent because of a listening device in the codefendant's car:

> [Massiah] was in 1958 a member of the crew of the S. S. Santa Maria. In April of that year federal customs officials in New York received information that he was going to transport a quantity of narcotics aboard that ship from South America to the United States. . . . [T]he agents searched the Santa Maria upon its arrival in New York and found in the afterpeak of the vessel five packages containing about three and a half pounds of cocaine. . . .  He was arrested, promptly arraigned, and subsequently indicted for possession of narcotics aboard a United States vessel.  In July a superseding indictment was returned, charging the petitioner and a man named Colson with the same substantive offense, and in separate counts charging the petitioner, Colson, and others with having conspired to possess narcotics aboard a United States vessel, and to import, conceal, and facilitate the sale of narcotics. The petitioner, who had retained a lawyer, pleaded not guilty and was released on bail, along with Colson.
>
> A few days later, and quite without the petitioner's knowledge, Colson decided to cooperate with the government agents in their continuing investigation of the narcotics activities in which the petitioner, Colson, and others had allegedly been engaged.  Colson permitted an agent named Murphy to install a Schmidt radio transmitter under the front seat of Colson's automobile, by means of which Murphy, equipped with an appropriate receiving device, could overhear from some distance away conversations carried on in Colson's car.
>
> On the evening of November 19, 1959, Colson and the petitioner held a lengthy conversation while sitting in Colson's automobile, parked on a New York street. By prearrangement with Colson, and totally unbeknown to the petitioner, the agent Murphy sat in a car parked out of sight down the street and listened over the radio to the entire conversation.  The petitioner made several incriminating statements

during the course of this conversation.  At the petitioner's trial these incriminating statements were brought before the jury through Murphy's testimony, despite the insistent objection of defense counsel.

*Massiah*, 377 U.S. at 202-203 (footnotes omitted).  Massiah argued that it was a violation of the Fifth and Sixth Amendments to use evidence "of incriminating statements which government agents had deliberately elicited from him after he had been indicted and in the absence of his retained counsel."  *Id*. at 204.  The Court agreed that statements obtained under the described circumstances "could not constitutionally be used by the prosecution as evidence."  *Id*. at 207.

   *Massiah* spawned a series of cases explaining the circumstances that render similar statements a violation of the Sixth Amendment.  The cases involving jailhouse informants are directly applicable here.  *See Miller v. California*, 392 U.S. 616 (1968) (dissent from denial of certiorari); *Procunier v. Atchley*, 400 U.S. 446 (1971); *Milton v. Wainwright*, 407 U.S. 371 (1972); *United States v. Henry*, 447 U.S. 264 (1980); *Kuhlmann v. Wilson*, 477 U.S. 436 (1986); *Kansas v. Ventris*, 556 U.S. 586 (2009); *see also Maine v. Moulton*, 474 U.S. 159 (1985) (where the informant, the petitioner's co-defendant, was outside of the jailhouse when he elicited the incriminating statements).

   The clearly established federal law from these cases can be summarized in the following statements:

   1. It violates the Sixth Amendment to "use[] against [a criminal defendant] at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206.

   2. The "rule . . . must apply to indirect and surreptitious interrogations . . . ." *Id*.

   3. The rule applies when an inmate informant deliberately elicits incriminating statements and that conduct is attributable to the government.  *Henry*, 447 U.S. at 270-72.

4.      The rule does not apply when an inmate informant only listens to the criminal defendant's spontaneous and unsolicited statements.  *Kuhlmann*, 477 U.S. at 460.

5.      Even if testimony is admitted that should have been excluded under *Massiah*, habeas relief is inappropriate if the error was harmless.  *Milton*, 407 U.S. at 373; *Arizona v. Fulminante*, 499 U.S. 279, 311 (1991).

Opinions applying this clearly established federal law reveal that determining whether an inmate informant deliberately elicits incriminating statements in a way that is attributable to the government, or simply serves as a listener, is a fact intensive inquiry.  *Compare Post v. Bradshaw*, 621 F.3d 406 (6th Cir. 2010) (court determined that Petitioner failed to carry his burden that the inmate informant was anything more than a listener), and *Ayers v. Hudson*, 623 F.3d 301 (6th Cir. 2010) (court determined that inmate informant was more than a listener based on surrounding facts); *see also Muehleman v. Florida*, 484 U.S. 882 (1987) (J. Marshall, in dissent from denial of certiorari, disagreed with majority's implicit conclusion that inmate informant was just a listener); *United States v. Cashin*, Nos. 91-2303, 91-2329, 1993 WL 106847 (6th Cir. Apr. 9, 1993) (just a listener); *United States v. Moore*, 917 F.2d 215 (6th Cir. 1990) (same); *United States v. Mohammed*, 501 F. App'x 431, 445-46 (6th Cir. 2012) (inmate informant did not deliberately elicit incriminating statements); *United States v. Stewart*, Nos. 91-5174, 91-5177, 1991 WL 276255 (6th Cir. Dec. 20, 1991) (same); *United States v. Moore*, 240 F. App'x 699 (6th Cir. 2007) (same).

There is nothing in the record here to suggest that the jailhouse "snitch" witnesses— Montinique Barnes and Otis Pipkins, Jr.—were anything more than listeners here.  Nor is there anything in the record to suggest that these witnesses were acting on behalf of the government when they "listened."  Petitioner's suggestion that the jailhouse "snitch" testimony violated his Sixth Amendment rights is groundless.

30

### B.    Presentation of knowingly false testimony

The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

> The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).  *See also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998).  Petitioner bears the burden of demonstrating that the testimony was actually perjured.  *Lochmondy*, 890 F.2d at 822.  "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id.*

Here, Petitioner presents only the affidavit of Tony Walker in support of his claim that the "snitch" testimony was perjurious.  Tony Walker swore:

> At the end of 2005 I was in the Muskegon County jail.  At a time while in there while on the first floor in a holding tank/cell I talked with one Montinque Barnes. At the time Montinque Barnes was charged with robbery of a person.  The whole time that Montinque Barnes and I was together we talked to each other.  At no time did Hyrosha Wilson come in to the holding tank and Hyrosha and I would have spoke to each other and I would have seen him come in there.

(Affid. of Tony Walker, ECF No. 9-29, PageID.1663.)  These is nothing in Walker's affidavit that directly contradicts the testimony of the jailhouse "snitches."  Walker never fixes a date or a time for his conversation with Barnes.  Thus, Petitioner's claim fails at the very first step: he has not shown the "snitch" testimony was false.

Because Petitioner has failed to show an independent constitutional violation to support his "newly discovered evidence" claim, he is not entitled to habeas relief.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

I further recommend that a certificate of appealability be denied.


Dated:  October 9, 2018                    /s/ Ray Kent
                                           United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).